UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| EMANUEL KAPELSOHN <br> 1771 Creekview Drive <br> Fogelsville, PA 18051 <br><br> and <br><br> CHRISTOPHER LEE <br> c/o Greenberg Law Offices <br> 6 E. Biddle St. <br> Baltimore, MD 21202 <br><br> Plaintiffs, <br><br> v. <br><br> BALTIMORE CITY POLICE DEPARTMENT, <br> 601 E. Fayette St. <br> Baltimore, MD 21202 <br><br> Defendant. | * <br> * <br> * <br> * <br> *    Civil Action. <br> * <br> * <br> * <br> * <br> * <br> * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*. \*

## PLAINTIFFS' EMERGENCY COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Emanuel Kapelsohn (Kapelsohn) and Christopher Lee (Lee), by and through undersigned counsel, respectfully move this Court for Declaratory and Injunctive Relief by issuing a preliminary injunction to enjoin the Baltimore City Police Department (BCPD) from enforcing a requirement that Kapelsohn, a forensic expert, provide a DNA sample to BCPD in order to examine evidence in a Mr. Lee's criminal case under Maryland jurisdiction, thereby depriving Lee of his constitutional right to effective assistance of counsel. In support of this motion, Plaintiffs state as follows:

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because this lawsuit alleges violations of the U.S. Constitution.

2. The Court has authority to grant declaratory and injunctive relief, and any other appropriate relief, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and under the Court's inherent equitable jurisdiction. A substantial, actual, and continuing controversy exists between the parties with respect to Plaintiffs' claims for declaratory and injunctive relief.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and the events giving rise to the claim occurred in this district.

**FACTS**

4. Plaintiff is a forensic expert with over forty-one (41) years of experience in the field of Forensic Science.[1]

5. Lee hired the Plaintiff to examine evidence and testify in the case of State v. Christopher Lee, Case No. 124044001, in the Circuit Court for Baltimore City.

6. Mr. Lee is currently being held at the Maryland Reception, Diagnostic, and Classification Center ("MRDCC") without bail since his January 14, 2024, arrest.

7. From October 22, 2024, until the filing of this motion, the undersigned has requested to inspect the vehicle, weapon, fired and unfired cartridges, recovered projectile, deceased's clothing, and any other physical evidence the State intends to use at trial.[2]

8. On November 13, 2024, the undersigned filed an Emergency Motion to Inspect Evidence in the Circuit Court to, among other issues, allow the Plaintiff to travel to Maryland to

---

[1] See Kapelsohn's curriculum vitae. Ex, 1
[2] See email chain from October 7, 2024 – November 13, 2024. Ex. 2

inspect and examine the evidence in the case, including, but not limited to, the firearm and ballistic materials involved in the underlying case – all of which are in the current custody of the State of Maryland. See Emergency Motion to Inspect Evidence. Ex. 3

9. On November 14, 2024, the State filed its response to Defendant's Motion:

> With respect to the request to examine the handgun, fired and unfired cartridges, recovered projectile and clothing, this request was made November 6, 2024. The State has made two separate attempts to determine what sort of inspection the defense expert is seeking to conduct of the firearms evidence in order to determine where this can take place and whether a firearms examiner needs to be present. Counsel has ignored both requests. Given the lack of response the State can arrange for a visual inspection and opportunity to photograph the evidence. Not being in the Firearms Unit and without an examiner no evidence may be removed from any heat sealed packages and the firearm may not be manipulated in any way, including but not limited to moving the slide, loading, unloading, or any form of trigger pull. The evidence will be available immediately after the vehicle inspection on November 20, 2024, and will take place at 601 East Fayette Street.

See State's Response. Ex. 4

10. The parties engaged in ongoing communications to schedule examinations of the evidence, including the weapon, vehicle, and other items collected by the police following the incident.

11. On November 17, 2024, the parties agreed that the examinations would occur on November 26, 2024. As noted in the email correspondence, the State never mentioned any requirement that our expert would be required to submit his DNA prior to examining the evidence.[3]

12. On November 19, 2024, a hearing on the Emergency motions was held before Judge Althea Handy in the Circuit Court for Baltimore City. For the first time, the State advised that Plaintiff would be required, pursuant to an unknown COMAR requirement, to submit his DNA before examining the evidence in the criminal case. The State did not offer any authority,

---

[3] See the email chain regarding firearm evidence examination. Ex. 5

be it from case law, the Maryland Rules, or COMAR, which tend to support its request of Mr. Kapelsohn's DNA sample but indicated that it would provide it after it received said requirements from BCPD.

13. Although Judge Handy granted Defendant's Motion to Inspect Evidence, that Order was conditioned on Mr. Kapelsohn submitting a DNA sample to the State.

14. On November 20, 2024, the State advised that:

> After consultation with the Chief I have been advised of the following:
>
> All who enter the lab spaces for testing or any reason will have their DNA swabs taken or they will not enter the space.
>
> I was instructed to forward the information on the letter of exception and the instructions to you for your witness to comply. The lab will be asking for a copy of the letter when you arrive. I did inquire if a Court Order would negate this requirement and they were not able to give me a definitive answer without seeing the Order. Please advise if you would still like me to draft a proposed order once you proved the information I requested previously.

See November 20, 2024, email. Ex. 6

15. On November 20, 2024, the State forwarded two pages of a 197-page document (pages 62-63), Forensic Science & Evidence Services Division, Quality Assurance Program Manual, Document ID: 10067-15, effective 01/25/2024, which states:

> In an effort to identify sources of potential contamination in the Laboratory, all employees and interns of the Forensic Science & Evidence Services Division of the Baltimore Police Department shall provide an oral swab standard for entry in the Quality Control Database at the beginning of their employment/internship.
>
> Any other persons entering the analytical space of the Laboratory for purposes such as evidence observation, evidence examination, in maintenance of instrumentation, equipment, or the building may similarly be required to provide an oral swab standard at the discretion of the DNA Technical Leader. The purpose of providing the oral swab is to eliminate the possibility of erroneously reporting forensic unknown profiles as unidentified individuals by identifying any contribution from staff and slash or vendors and visitors. The collection of the oral swab sample will be documented using the authorization for collection of DNA sample for quality

control DNA index form signed by the individual giving the sample and then given to the DNA Technical Leader for maintenance.

The oral swab sample will be technically reviewed by a competent DNA analyst who will then enter the DNA profile into the Quality Control DNA Index using an anonymous person all identifier. Once the profile has been successfully uploaded into the Quality Control DNA Index the original sample must be destroyed.

The list of names of profiles that were entered along with the associated personal identifier codes will be maintained by the DNA Technical Leader. This list will only be made available to the Chief, Laboratory Director(s), and/or Laboratory Deputy Director(s) as needed.

The DNA Technical Leader may purge profiles from the DNA Quality Control Index if it is determined that the profile is no longer relevant.

If an individual's DNA profile is identified when the Quality Control Index is searched, the individual's name shall not be released. The Chief, Laboratory Director(s), and/or Laboratory Deputy Director(s) shall have the responsibility for overriding this policy when requested and granted through legal channels. When staff contamination events occur, a corrective action process must be initiated and documented to identify and correct the source of the contamination.

See BCPD manual. Ex. 7.

16. On November 21, 2024, the undersigned advised the State that Plaintiff's scope of examination consisted of:

I will not be firing the gun and will therefore not need access to any shooting range or other firing facility or equipment. I will not be performing any microscopic examinations.

I will want to examine and handle the firearm(s), operating its various mechanisms and controls (e.g., slide, slide release, magazine, magazine release, trigger, manual safety if applicable. I will want to weigh the trigger pull using standard trigger pull weights. I may want to cycle action-proving dummies or dummy rounds through the magazine and action. I will not field strip or otherwise disassemble the firearm(s). With the firearm(s) and other items of evidence, I will want to be able to visually examine them, and examine them with low-power, hand-held magnifiers, photograph, measure, and weigh the items using cameras, rulers, electronic digital calipers, and electronic digital scales I will bring with me.

I would bring with me into the laboratory my note-taking materials (pad and pens), and my own small tool kit, containing items I routinely use for inspecting evidence, including rules and rulers, digital electronic caliper, digital electronic scales, trigger

> pull weights, action proving dummies or dummy rounds, small magnifiers, cell phone (for use as camera), small tools (punches, screwdrivers, scissors, forceps, etc.), rubber or nitrile gloves, masking and other tape, several small flashlights, plastic clips (to hold small items for photographing), etc.
>
> Regarding my competence to perform inspections such as I will be performing, I have performed such inspections for the past 40-plus years, during which time I have been qualified to testify concerning my findings in state and federal courts in approximately 15-16 federal courts in 13 states, and some 40 state courts in 25 or more states. I have developed armorer programs and taught armorer courses throughout the United States and elsewhere for firearms manufacturers including Glock, Mossberg, ParaOrdnance, Kimber, and others. I have, for example, trained and certified over 1,800 law enforcement armorers for Glock, including armorers for the Baltimore City Police Department. I have consulted, investigated, and testified concerning technical aspects of firearms, ammunition, ballistics and ballistic evidence, and related topics in hundreds of criminal and civil cases over the past 40-plus years. Further details of my experience and qualifications are contained in my curriculum vitae, previously provided to counsel.

See November 21, 2024, email. Ex. 8

17. The State also advised the undersigned that he would also need to provide DNA to be permitted to enter the room and watch Mr. Kapelsohn's inspection and examination. See November 21, 2024, email. Ex. 9.

18. The State has not raised a particularized concern that any pieces of evidence will become contaminated but rather unilaterally decided that the weapon *must be examined in a room where the expert and counsel must submit to DNA testing, despite the policy being permissive, not mandatory*.

19. Plaintiffs and the undersigned are uncertain as to the State's reason for collecting Kapelsohn's and the undersigned's DNA as a condition precedent to Kapelsohn's inspection of the firearm as the State, through BCPD, already fully investigated each the gun and has not indicated that it intends on taking any future DNA tests of it.

20. On November 21, 2024, the undersigned proposed that Plaintiff be permitted to inspect and examine the evidence in any room that does not have the permissive requirements that the BCPD Laboratory has. *Id.*

21. On November 21, 2024, the State communicated its absolute refusal to Defense's proposed solution. *Id.*

22. Although the undersigned maintained its general opposition to providing both the undersigned and Kapelsohn's DNA sample, in an effort to keep the scheduled November 26, 2024, examination, the undersigned proposed to Ms. LaPolla in an effort to avoid potential state or potential federal litigation over this matter, and to avoid delaying the trial and afford Mr. Lee his constitution right to a fair trial, to allow the DNA test only if the DNA would be sealed by the court prior to any electronic recording of the data, and then unsealed after the trial and destroyed with a letter of completion forwarded to counsel.

23. Ms. LaPolla responded, "Your request has been forwarded to the lab director." Id.

24. On November 26, 2024, Kapelson emailed the undersigned the following:

Attorney Greenberg:

I am not willing to provide a DNA sample. It is intrusive, unnecessary, a violation of my privacy and my body, and is designed to obstruct our discovery and investigation which is the defendant's Constitutional right. What if the State were also to decide I need to submit to a polygraph exam to examine the evidence? I'm sure some apparently logical rationale could be contrived for that, too. The fact is, a DNA sample is unnecessary. The State has already done whatever tests and examinations it wished to do on these items of evidence. In the highly unlikely event that a need to exclude some later-discovered DNA on the evidence might arise in the future, my DNA could be obtained at that time, under controlled circumstances that do not allow state employees, outside the Court's control, to possess and do what they choose with my DNA, possibly to my detriment and the violation of my rights.

The DNA sample is stated to be a requirement in order to enter the laboratory. There is no reason my inspection needs to occur in the laboratory. I have examined evidence in hundreds of cases throughout the United States - most recently on

> Friday for the prosecution in a double homicide case in Wisconsin — in rooms in police headquarters, district attorneys offices, police impound lots, courthouses, and evidence storage facilities. I have never, not once in 41 years as an expert witness, been required to provide a DNA sample. During that time I have worked as an expert for the U.S. Department of Justice, other federal agencies, branches of our military, Attorney Generals' Offices of several states, for and against many District Attorneys' or Prosecutors' Offices, cities including New York City, Philadelphia, Chicago, San Diego, Nashville, Milwaukee, and others, the Arizona Department of Public Safety, the Delaware Department of Justice, and many other public and governmental agencies, and have never been asked to provide a DNA sample. I am not using any laboratory equipment or laboratory facilities. These same items of evidence were collected in the field, and were in the possession of law enforcement officers before being transported to the crime lab. They will presumably be transported to the courthouse and into the courtroom for trial. They can be examined by me elsewhere than in the laboratory so that a DNA sample is not needed, even by the laboratory's requirements. Certainly everyone in the courtroom is not going to be required to provide a DNA sample, nor, I expect, were the police officers who collected or transported these items to the laboratory, or who will transport the items to trial, be required to provide DNA samples.
>
> The state raises a red herring when it tells the Court my inspection must be done in the laboratory in order to support my "firing" of the handgun with dummy rounds. Dummy rounds are inert pieces of plastic and/or metal used to simulate cartridges; they do NOT "fire." No firing of the gun will occur in my proposed inspection.
>
> The State raises another red herring when it states or implies that I seek to conduct any aspect of my evidence inspection outside the view or control of the state's evidence custodians or other representatives. My inspections are typically conducted with the state's representatives present to observe that nothing improper is done with the evidence, and I certainly have no objection to that being done here.

See November 26, 2024, email. Ex. 9.

25. Kapelsohn contends that Maryland law does not support this requirement and infringes upon his professional and personal rights.

26. As of the filing of the motion, the State has not reached a decision. However, due to the critical deadlines that must be met in order to provide a proper defense to Mr. Lee, this motion needs to be addressed now.

27. The undersigned communicated with the Office of the Public Defender of Maryland and received confirmation that

28.     Lee's trial is currently scheduled for January 6, 2025, hence the expedited nature of this Emergency Complaint for Declaratory and Injunctive Relief.

## LEGAL STANDARD FOR PRELIMINARY INJUNCTION

29.     An injunction is an equitable remedy. It is not a remedy which issues as of course, or to restrain an act the injurious consequences of which are merely trifling. An injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable. The basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies. Weinberger v. Romero-Barcelo, 456 U.S. 305, 306, 102 S. Ct. 1798, 1800, 72 L.Ed.2d 91, 95 (1982)

30.     Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a nice adjustment and reconciliation between the competing claims. In such cases, the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. The essence of equity jurisdiction has been the power of the chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. *Id.*

31.     In Maryland, a party seeking a preliminary injunction must satisfy a common law, four-factor test. *Fuller v. Republican Central Committee*, 444 Md. 613, 635-36, 120 A.3d 751 (2015). Those four common law factors are:

> 1. The likelihood that the plaintiff will succeed on the merits;
> 2. The "balance of convenience" of the parties, which is whether greater injury would result from the issuance of the injunction than from its denial;
> 3. Whether plaintiff will suffer irreparable injury if the injunction is denied; and
> 4. The public interest.

*DOT., Motor Vehicle Admin. V. Armacost*, 299 Md. 392, 404-05, 474 A.2d 191 (1984).

32. The burden of proof and persuasion at all times is on the party seeking the injunction. *Eastside Vend Distributors, Inc. v. Pepsi Bottling Group, Inc.*, 396 Md. 219, 241, 913 A.2d 50 (2006). The party opposing the injunction has no burden. Although the law in Maryland was once to the contrary, an injunction will not be denied merely because the party seeking it has an adequate remedy at law. Md. R. 15-502(c); *see Anne Arundel Co. v. Whitehall Ven.*, 39 Md. App. 197, 200 n. 2, 384 A.2d 780 (1978).

A. **Likelihood of Success on the Merits**

Under Maryland law, there is no statutory requirement or reported case law that mandates a forensic expert or attorney must submit to a DNA test to examine evidence in a case. The relevant statutes and reported cases focus on the conditions under which DNA testing can be requested and utilized in postconviction proceedings, but they do not impose such a requirement on forensic experts or attorneys.

1. <u>The Court's Ruling Exceeds the Scope of Maryland Rule 4-263.</u>

The authority of a trial judge to facilitate the discovery of tangible evidence in the State's possession is not absolute. See Cole v. State, 378 Md. 42, 57–58 (2003).  Rather, "trial judges have no power beyond that conferred by Rule 4-263 to order discovery of tangible evidence," and although trial courts retain the authority to "either require or permit discovery," the court's pre-trial discovery power "is strictly limited to that which is permitted by statute or court rule or mandated by constitutional guarantees." Id. (emphasis added). Maryland Rule 4-263(d)(10) specifically provides that defendants are entitled to the "opportunity to inspect, copy, and photograph all items obtained from or belonging to the defendant." At the same time, however, Rule 4-263 does not authorize either the State or the Court to transform the Defendant's

otherwise guaranteed discovery rights into merely conditional discovery privileges – including imposing the condition that both Defense's counsel and expert witness provide a DNA sample to the State. Pursuant to Cole v. State, 378 Md. 42 (2003) and progeny, this Court exceeded the limited scope of Maryland Rule 4-263 by requiring Mr. Kapelsohn to provide a DNA sample to the state, and the Court should reconsider its previous ruling in light of the foregoing authorities.

    2.    <u>There is an Easier Resolution to Challenging the Constitutionality of Forcing an Expert and Attorney to Submit to DNA Testing.</u>

Imposing demands that the undersigned and an expert provide DNA samples to the State is not only highly invasive, but also entirely unnecessary. All of the State's concerns regarding potential DNA contamination of other evidence within the BPD laboratory can be resolved if the State simply agrees to have the examination occur in a room other than the laboratory. Other evidence will be inspected and examined in a room other than the laboratory, why can't the weapon? Yet, the State blanketly rejected that mutually beneficial solution. Mr. Lee should not have to bear the burden and another delay in trial due to the State's refusal to engage in a good faith to resolve these issues, and the Court should not vindicate that behavior by affirming its previous ruling. Again, the State is not saying that it intends to re-test the weapon or other evidence, simply that Mr. Kapelsohn and my presence in the lab could hypothetically contaminate something in the lab which could affect other cases, assuming the lab doesn't clean up after visitors leave. This simplistic request ends this perceived obstructionist behavior without ever addressing the potential constitutional elements of the lab's permissive requirements.

    3.    <u>Compelling a DNA Sample Violates the Fourth Amendment.</u>

Even if this Court's previous ruling did not exceed the scope of Maryland Rule 4-263, the State's demand that both Defense counsel and Defense's expert witness be compelled to submit a DNA sample to the State violates the Fourth Amendment right to privacy and the prohibition

against unlawful searches. Both the undersigned and Mr. Kapelsohn possess a reasonable expectation of privacy in their DNA profile for which they do not waive. See Maryland v. King, 569 U.S. 435, 446 (2013) ("Virtually any intrusion into the human body will work an invasion of a cherished personal security that is subject to constitutional scrutiny." (internal citations omitted)); Varriale v. State, 444 Md. 400, 411–12 (2015) ("[U]sing a buccal swab on the inner tissues of a person's check in order to obtain DNA samples is a search.") The State possesses no probable cause or search warrant upon which it may support an invasion into said parties' expectation of privacy, and a court Order compelling said DNA collection violates the Fourth Amendment.

      4.     <u>Compelling a DNA Sample Also Violates the Sixth Amendment.</u>

The Sixth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, grants criminal defendants the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (citing McMann v. Richardson, 397 U.S. 759, 771 n.1, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)).

Defense's expert witness, Mr. Kapelsohn, strongly opposes the requirement that he be forced to submit a DNA sample to the State. Assuming arguendo that this Court affirms its previous Order compelling Mr. Kapelsohn to comply with the State's demand, Mr. Kapelsohn will likely—and justifiably so—refrain from conducting his inspection of Mr. Lee's firearm altogether. Preventing Defense's expert witness from testifying about an otherwise material, highly probative, and potentially dispositive investigation deprives Mr. Lee of his "right to enlighten the judgment of the tribunal, be it the jury or the judge . . . through qualified experts." Yudkin v. State, 229 Md. 223, 228 (1962); see also Smith v. California, 361 U.S. 147, 164 (1959)

("[T]o exclude such expert testimony is in effect to exclude as irrelevant evidence that [which] goes to the very essence of the defense and therefore to the constitutional safeguards of due process.") (J. Frankfurter, concurring). For these reasons, Mr. Lee's Sixth Amendment right to effective assistance of counsel will also be violated by granting the State's request. Defense requests that the Court reconsider its previous ruling in light of the resulting Sixth Amendment violations.

5. <u>Compelling the Undersigned to Submit a DNA Sample Also Violates the Fourteenth Amendment.</u>

The Fourteenth Amendment Due Process Clause guarantees the right to engage in the profession of one's choosing without unreasonable government intrusion. See generally Conn v. Gabbert, 526 U.S. 286 (1999) (discussing an attorney's Fourteenth Amendment right to practice law). Requiring the undersigned to surrender DNA to the State in order to perform the job that he lawfully performed without issue for nearly thirty (30) years constitutes an unreasonable, unconscionable, and unjustifiable government intrusion into the undersigned's Fourteenth Amendment right to engage in the profession law. Affirming the State's demand will prevent Defense counsel from assuring inspecting the firearm and therefore prevents the undersigned from assuring that a thorough and sufficient inspection is performed by Mr. Kapelsohn.

6. **The State's Demand Violates the Maryland Rules of Professional Conduct.**

The State's demand that Defense counsel and Defense's expert witness be required to provide a DNA sample in order to inspect Mr. Lee's firearm runs afoul of Maryland Rule 19-303.4(a) which provides, in pertinent part, that "An attorney shall not . . . unlawfully obstruct another party's access to evidence." As explained supra, Mr. Lee is entitled to inspect his firearm pursuant to Maryland Rule 4-263(d)(10), and the State obstructs that right by demanding additional conditions not otherwise authorized by law. To that end, it should be noted that the

State has already authorized Defense counsel and his expert witness to inspect other tangible evidence in non-laboratory rooms without any objection whatsoever, including pertinent evidence such as the Decedent's personal effects. Rule 19-303.4(c) further prohibits the State from "knowingly disobey[ing] an obligation under the rules of a tribunal," which would include the State's obligation to permit inspection of the firearm pursuant to Rule 4-263(d)(10). In addition, Rule 19-303.4(d) also prohibits the State from "fail[ing] to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party." Because Defense's request to inspect the firearm is explicitly authorized Rule 4-263(d)(10), the State has refused to comply with Defense's legally proper discovery request.

For all of the reasons above, the likelihood of success weighs heavily in favor of the Plaintiffs.

**B.     The "balance of convenience" of the parties, which is whether greater injury would result from the issuance of the injunction than from its denial**

To date, the State has not, and likely cannot, point to one reason why they cannot allow Kapelsohn and the undersigned to examine the evidence either in the lab or in another room. The injury to the Plaintiffs is irreparable if this court allows BCPD to enforce a permissive requirement contained in the BCPD internal manual. First, an internal manual is not a source of law that is binding on anyone, let alone a court of law. Second, even if the manual possessed any force of law whatsoever, which it does not, the manual, in its strictest terms, merely provides that someone *may* be required to provide a DNA sample. Third, even if Kapelsohn's and the undersignd's DNA samples were lawfully requested, the authority to make that request is within the sole discretion "of the DNA Technical Leader," which Ms. LaPolla is not. The State has also not provided any evidence that the current DNA Technical Leader specifically requested that Mr. Kapelsohn submit a DNA sample in the first place. Fourth, even if the current DNA Technical

Leader actually requested Mr. Kapelsohn's DNA, complying with that request would not serve the purpose of "eliminat[ing] the possibility of erroneously reporting forensic unknown profiles" given that the State has already conducted all of its forensic testing as it relates to this case. Finally, even if every single one of the foregoing considerations weighed in the State's favor, there is absolutely nothing in the manual, the memo, or even COMAR, which provides that these regulations supersede a criminal defendant's pretrial discovery rights. By all accounts, conditioning Mr. Kapelsohn's and the undersigned's inspection of Mr. Lee's property upon receipt of his DNA sample is not authorized by Maryland law, and the Court should reconsider its previous ruling accordingly.

If BCPD's permissive request is allowed to stand, a chilling effect will occur with experts and counsel as each would be forced with the choice of giving up their constitutional rights in order to inspect evidence or, deny their client a fair trial if they enforce their constitutional rights and refuse to provide their DNA, allow it to be registered in a database with no assurances that the procedures will be followed, not knowing how their DNA could be used in the future.

The balance of equities tips in favor of Plaintiffs, as the harm to Plaintiffs' privacy and professional integrity outweighs any speculative benefit to the BCPD from obtaining Plaintiff's DNA sample. Therefore, allowing BCPD's internal policy to exist would deny justice to Lee and injure the Plaintiffs.

**C.    Whether Plaintiff Will Suffer Irreparable Injury If The Injunction Is Denied**

As discussed above, the Plaintiffs will suffer irreparable injury if the injunction is denied.

**D.    The Public Interest.**

The public interest in having a fair trial lies in ensuring that justice is served transparently, upholding the principle of due process, and maintaining public confidence in the

legal system by allowing open access to court proceedings, which discourages bias, misconduct, and arbitrary decision-making by authorities; essentially, it guarantees that everyone is treated equally under the law and that the truth is revealed through a transparent process. If an injunction is not granted and if the government, through BCPD, can create internal rules that violate citizen's rights, the justice system fails. There is nothing in the law that supports BCPD's arbitrary and permissive manual. Defendants have a right to a fair trial. They have a right to hire a lawyer and experts who should not be unduly obstructed from examining evidence pursuant to the rules. Granting the injunction is a step towards providing Mr. Lee counsel and an expert of his choosing, which will lead to a fair trial. A fair trial ensures that everyone, regardless of their social status, has the opportunity to defend themselves against accusations and is presumed innocent until proven guilty.

## **CONCLUSION**

The State's requirement that an expert with forty (40) plus years of experience and counsel with almost thirty (30) years needs to provide DNA samples prior to examining evidence in a criminal case, must be stopped. This requirement is in violation of the Fourth Amendment to the United States Constitution, U.S. Const. amend. IV made applicable to the states through the Fourteenth Amendment, which provides that the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated. Plaintiffs, therefore, request this court grant a preliminary injunction to permit Kapelsohn and the undersigned to inspect the evidence without providing a DNA sample.

WHEREFORE, Plaintiffs respectfully request that this Court grant a preliminary injunction enjoining the Baltimore City Police Department from enforcing the requirement that Plaintiffs provide a DNA sample in order to examine evidence in the case under Maryland

jurisdiction.

        Respectfully submitted,

        **GREENBERG LAW OFFICE**

        <u>s/ Lawrence S. Greenberg</u>
        LAWRENCE S. GREENBERG
        (BAR #23642)
        6 E. Biddle Street
        Baltimore, MD 21202
        Tel: (410) 539-5250
        Fax: (410) 625-7891
        larry@greenberglawyers.com
        brice@greenberglawyers.com
        *Attorneys for the Plaintiffs*